

# SUPREME COURT OF MISSOURI
## en banc

THE KANSAS CITY CHIEFS )    *Opinion issued June 2, 2020*
FOOTBALL CLUB, INC., )

    Appellant, )

and )

JACKSON COUNTY SPORTS )
COMPLEX AUTHORITY, )

    Intervenor-Appellant, )

v. )    **SC97730**

DIRECTOR OF REVENUE, )

    Respondent. )

### Petition for Review of a Decision of the Administrative Hearing Commission
### The Honorable Sreenivasa Rao (Sreenu) Dandamudi, Commissioner

The Kansas City Chiefs Football Club, Inc., (the team) petitions this Court for review of the decision of the Administrative Hearing Commission (AHC) holding it was the "purchaser," as that term is used in Missouri's sales and use tax statutes,[1] of certain items used in the renovation of Arrowhead Stadium and its related facilities and was, therefore, liable for sales and use tax on those items. For the reasons set forth below, the

---

[1] *§ 144.605(6), RSMo 2000* (use tax); *§ 144.010.1(7), RSMo Supp. 2008* (sales tax).

AHC erred in determining the team was the purchaser of the contested items. The AHC's decision is reversed.[2]

## I.  FACTUAL AND PROCEDURAL BACKGROUND

The team is a professional football club and member of the National Football League. The team plays its home games at Arrowhead Stadium, part of the Harry S. Truman Sports Complex located in Jackson County, Missouri. The county, a political subdivision of the State, owns the complex and leases it to the Jackson County Sports Complex Authority, itself a political subdivision of the State established by the county. The legislature has given first-class counties such as Jackson County the power to create sports complex authorities for the purpose of, *inter alia*, acquiring, constructing, operating, and leasing sports complexes. *See §§ 64.920, 64.940, RSMo 2000*. The authority subleases to the team portions of the sports complex, including Arrowhead, adjacent administrative offices, and a separate training facility. By agreement, the team, as tenant, manages and operates its subleased portion of the property. Other portions of the complex are leased to the Kansas City Royals Baseball Corporation.

In 2006, the county, the authority, and the team forged an agreement that the county would renovate Arrowhead and its related facilities. In consideration for the county's renovation, the team agreed to a 25-year extension of its sublease of Arrowhead and its

---

[2] As the items were not taxable to the team in the first instance, this Court does not reach the issue of ownership of the contested items or the applicability of the exemptions claimed by the team for some or all of the items.

related facilities.[3]  In undertaking the renovation, the county, the authority, and the team worked hand-in-hand with the Missouri Development Finance Board (finance board), as did the Kansas City Royals baseball team for the renovation of Kaufmann Stadium that occurred at the same time.  Generally speaking, the finance board exists to "promote the economic development" of the State.  *§ 100.270(3), RSMo 2000*.  The statutes governing the finance board provide it with special tax credit and other funding mechanisms for projects that economically benefit Missouri communities.  *See Missouri Development Finance Board Act, § 100.250 et seq., RSMo 2000*.

Pursuant to the renovation plan, the team executed the sublease extension, and the county and the authority entered into a development agreement with the team for the purpose of carrying out the "Arrowhead Stadium Expansion and Renovation Project" (the project).  The county then executed a trust indenture, which, in relevant part, created a "project fund," and the parties executed a tax credit agreement with the finance board (collectively, the governing agreements).  These governing agreements controlled the ownership, operation, and funding for the project.

As to ownership, the development agreement specifically provided: "the County shall own the Project for public purposes as provided herein."  *§ 4.01(a), Development Agreement*.  The team as tenant was required to "manage and oversee the planning, design,

---

[3] The 2006 sublease agreement amended an earlier sublease agreement executed in 1990. The effectiveness of the 2006 sublease amendment depended on securing the funding for the renovation.  Specifically, it depended on the passage of a 3/8-cent county sales tax and a commitment that the authority would receive "Missouri State Tax Credit revenues." *§ 1.3, 2006 Sublease Amendment*.  Funding for the project is discussed further *infra*.

development, construction, completion and making operational of the Project in accordance with the [governing agreements]." *§ 4.01(b), Development Agreement*.

As for funding, the development agreement required both the team as tenant and the authority/county as landlord/owner to make contributions to help fund, or to secure funding for, the project.[4] The authority/county were to make their contributions through the use of voter-approved taxes and the county's sale of bonds.[5] The team agreed to make its contributions through cash donations to the finance board in return for tax credits issued by the finance board pursuant to section 100.286.6;[6] the finance board in turn agreed to grant the cash donations to the project, and the team agreed to let the county sell the tax credits issued by the finance board and make an additional donation of all proceeds from the sale to the county for use in the project. The finance board agreed to this plan – to issue tax credits and provide the donations to the project – based on its finding that the project

---

[4] In this regard, the development agreement treated the authority and the county as the same entity, stating: "Landlord/County intends to provide the funds for the Landlord/County's Capped Contribution …." *§ 6.05(b)(i), Development Agreement*. It further provides "Landlord [the authority] and the County, with a financial contribution from Tenant [the team], wish to complete [the project]." *Recital E, Development Agreement*.

[5] The county issued special obligation bonds to raise money for the project. Jackson County voters approved a 3/8 cent county-wide sales tax, which provided most of the revenue needed to repay the bonds.

[6] Section 100.286.6, RSMo 2000, provides, in relevant part:

> Any taxpayer shall be entitled to a tax credit against any tax otherwise due under the provisions of chapter 143, RSMo, excluding withholding tax imposed by sections 143.191 to 143.261, RSMo, chapter 147, RSMo, or chapter 148, RSMo, in the amount of fifty percent of any amount contributed in money or property by the taxpayer to the development and reserve fund, the infrastructure development fund or the export finance fund during the taxpayer's tax year [.]

provided substantial economic benefits to Kansas City, Jackson County, and the whole State.[7]

The project fund was an indentured trust account created between the county and Wells Fargo Bank as trustee. The team was not a party to the indenture, which specifically provided the monies in the project fund were county monies:

> The following *funds of the County* are hereby created and established with the Trustee:
>
> ….
>
> (4) **Project Fund**, which shall contain a Chiefs Account (within the Chiefs Account a Bond Proceeds Subaccount, a Non-Bond Proceeds Subaccount and an Investment Earnings Subaccount) ….

*§ 401(a)(4), Trust Indenture* (emphasis added).[8]

The governing agreements required disbursements for the renovation of Arrowhead to be made from this project fund, which could be used for no purpose other than the project. The trust indenture that created the project fund authorized only the trustee to make disbursements from the fund, and the trustee was authorized to do so only after

---

[7] The finance board found "[t]he benefits to be derived by the State of Missouri are projected to exceed the benefits provided by the Board by this Agreement" by:

> (i) enhancing tourism in Jackson County and the State of Missouri, (ii) creating and retaining temporary and permanent jobs; (iii) retaining existing jobs; (iv) increasing local and state tax revenues; (v) extending the useful life of public facilities the voters of the County have determined to be of vital importance to the County, and (vi) eliminating the risk of the Tenant canceling the Amended Lease as a result of a failure of the Landlord to provide or make available funds to adequately maintain Arrowhead Stadium.

*§ 2.1, Tax Credit Agreement.*

[8] The team was a third-party beneficiary of the disbursement procedures established within the trust indenture. *§ 6.05(d)(i), Development Agreement.*

receiving the approval of the county and the authority. *§ 404, Trust Indenture*.

The parties acted in accordance with the plan set forth in the governing agreements: the team made cash donations to the finance board and received tax credits, which initially were placed into the project fund created by the trust indenture. The county then sold the tax credits to unrelated third parties. Proceeds from the sale, which the team donated to the county for use in the project, were placed in the project fund by the project fund trustee. After issuing the tax credits, the finance board disbursed the cash donations it received to the project, and those funds were likewise deposited into the project fund. The tax credits, in the hands of unrelated third parties, played no further role and were not a part of the project fund when the contested items were purchased.

Although the development agreement delegated to the team, as tenant, the operational responsibility for the renovation, both it and the trust indenture required the team to follow a specified procedure and provide verifying documentation to obtain the permission and approval of the authority as landlord and the county as owner for disbursement or reimbursement of funds needed to acquire approved project items. *§ 6.06(c), Development Agreement*; *§ 404, Trust Indenture*; *Ex. G, Development Agreement*. Many of the planned improvements to Arrowhead and its related facilities, such as replacing the existing scoreboards with state-of-the-art scoreboards, were identified as "minimum required project elements" and, therefore, had to be completed during the project.

Before the renovation began, the team obtained a tax exemption certificate and

presented it to each vendor when ordering items for the project[9] and, therefore, did not pay tax on project items. After completion of the project, the Director of Revenue conducted a sales and use tax audit[10] and, in November 2014, determined the team was liable for sales and use tax on the following categories of contested items purchased from the nine vendors at issue in this appeal (as well as on certain additional items from these and other vendors that are no longer in issue):

1) video equipment linking the new scoreboards and sound systems;

2) LED end-zone scoreboards and ribbon scoreboards circling the middle level of the stadium;

3) wayfinding signs;

4) televisions for throughout the stadium, including in the concourses, near concessions stands, and in suites;

5) a statue of Lamar Hunt and the clay molds used to create it;

6) business furniture, including desks, chairs, and more; and

7) furniture for the club level, private suites, and concourses.

The team appealed to the AHC, which in January 2019 found the team liable for sales tax of $252,775.39 and use tax of $677,171.55 on the contested items, plus statutory interest. The team sought this Court's review. This Court has exclusive appellate jurisdiction in all cases involving the construction of Missouri's revenue laws. *Mo. Const. art. V, § 3.* "A 'revenue law' is one that imposes, amends, or abolishes a tax or fee," and

---

[9] The authority and the county are tax-exempt entities under section 144.062, RSMo Supp. 2007.

[10] The audit covered the following tax periods: 1) sales tax for February 1, 2008, through January 31, 2011; and 2) use tax for January 1, 2008, through December 31, 2010.

includes this State's sales and use tax laws at issue here. *Armstrong-Trotwood, LLC v. State Tax Comm'n, 516 S.W.3d 830, 834 (Mo. banc 2017)*.

## II. STANDARD OF REVIEW

"This Court will affirm a decision of the AHC if it: (1) is authorized by law; (2) is supported by competent and substantial evidence on the whole record; (3) does not violate mandatory procedural safeguards; and (4) is not clearly contrary to the General Assembly's reasonable expectations." *Bus. Aviation, LLC v. Dir. of Revenue, 579 S.W.3d 212, 215 (Mo. banc 2019)*; § 621.193, RSMo 2016; *Mo. Const. art. V, § 18*. This Court does not uphold a decision of the AHC if it is "arbitrary, capricious, unreasonable, unlawful, or in excess of jurisdiction." *Myron Green Corp. v. Dir. of Revenue, 567 S.W.3d 161, 164 (Mo. banc 2019)*. This Court reviews the AHC's legal decisions *de novo*. *Id.* "This Court is not bound by the [AHC]'s interpretation and application of the law." *Gervich v. Condaire, Inc., 370 S.W.3d 617, 620 (Mo. banc 2012)*.

"While it is the taxpayer's burden to establish the right to an exemption, it is the Director's burden to show a tax liability." *Six Flags Theme Parks, Inc. v. Dir. of Revenue, 102 S.W.3d 526, 529 (Mo. banc 2003)*; *see also § 136.300.1, RSMo Supp. 2014*. In determining tax liability, sales and use tax statutes are strictly construed against the Director. *§ 136.300.1, RSMo Supp. 2014*; *Becker Elec Co. v. Dir. of Revenue, 749 S.W.2d 403, 406 (Mo. banc 1988)*. "[T]he question of exemption will arise only if we find that appellant was the purchaser of the [items] and was thus subject to sales and use taxes. Therefore, in determining whether appellant was the purchaser, the sales and use tax laws will be strictly construed against respondent." *Becker Elec., 749 S.W.2d at 406*.

8

### III. TAXATION REQUIRES BOTH CONSIDERATION AND OWNERSHIP

The AHC found the team both: (1) gave consideration for the contested items under the applicable sales and use tax statutes, and (2) acquired ownership of those items. The AHC concluded the team was, therefore, liable for the applicable sales or use tax on those items. The team asserts it neither gave consideration nor owned the contested items; the Director contests both assertions. Because the team did not provide valuable consideration in exchange for the contested items, this Court finds the team was not the purchaser of the items under the Missouri sales and use tax statutes.

#### A. To Be a "Purchaser" Subject to Tax Under the Sales and Use Tax Statutes Requires Both Providing a Valuable Consideration and Title or Ownership

A use tax "is imposed for the privilege of storing, using or consuming within this state any article of tangible personal property purchased." *§ 144.610.1, RSMo 2000.* For use tax purposes, "purchaser" means "any person who is the recipient for a valuable consideration of any sale of tangible personal property …." *§ 144.605(6), RSMo 2000.* A "purchase" is "the acquisition of the ownership of, or title to, tangible personal property, through a sale, as defined herein …." *§ 144.605(5), RSMo 2000.* "Sale" is defined "herein" as "any transfer … of the title or ownership … for a consideration paid or to be paid." *§ 144.605(7), RSMo 2000.*

Sales taxes are imposed "[u]pon every retail sale in this state of tangible personal property." *§ 144.020, RSMo Supp. 2006.* The sales tax statutes similarly define a sale as the transfer "of the ownership of, or title to, tangible personal property to the purchaser, for use or consumption and not for resale in any form as tangible personal property, for a

9

valuable consideration." *§ 144.010(10), RSMo Supp. 2006*.[11]

Therefore, under both the sales and use tax statutes, a taxpayer is a "purchaser" that has engaged in a taxable transaction if the taxpayer (1) provides a valuable consideration (2) in exchange for the acquisition of title or ownership over the property. *Becker Elec., 749 S.W.2d at 407*. Conversely, a taxpayer is not a purchaser, and has not engaged in a taxable transaction, if the taxpayer does not both (1) provide a valuable consideration and (2) thereby acquire title or ownership rights in the property. *Id.*

While "purchaser" is, therefore, a two-part inquiry, there is no need to reach the issue of title or ownership in this case because, unless the Director showed the team provided a valuable consideration in exchange for the contested items, the team is not a "purchaser" subject to tax as a matter of law.[12] In other words, "ownership" alone does not determine the identity of the "purchaser" subject to sales and use taxes. Absent a purchase to which sales tax applies, even were the team the "owner" of the items, the team

---

[11] "Purchaser" for sales tax purposes means "a person who purchases tangible personal property or to whom are rendered services, receipts from which are taxable under sections 144.010 to 144.525." *§ 144.010.1(7), RSMo Supp. 2006*. "Purchasers" are responsible for paying to the seller the amount of sales tax due, *§ 144.060, RSMo 2000*, and the seller of tangible personal property is generally responsible for collecting sales tax from the purchaser and remitting the tax collected to the Director. *See § 144.080, RSMo 2000*; *§ 144.021.1, RSMo 2000*; *§ 144.285, RSMo 2000*. Sales tax can be collected directly from a purchaser, however, if the purchaser claimed a tax exemption at the time of sale which is later found to be improper. *§ 144.210.1, RSMo 2000*.

[12] This Court notes, however, that the basis on which the AHC determined the team was the owner of *all* of the contested items was that the team was listed as "owner" on certain purchase agreements. The AHC failed to note, however, that the team was listed as owner on purchase orders with only three of the nine vendors at issue in this appeal (and on purchase orders with only six of the 12 vendors at issue before the AHC). Even were the AHC's reasoning logical, therefore, it does not resolve the question of ownership as to the six vendors still at issue in this appeal with whom the team was not listed as owner.

10

would not owe tax on someone else's purchase. *Id. at 408* (holding, even were the appellant considered the owner of items, the "[a]ppellant did not part with valuable consideration and [wa]s not the purchaser"). In particular, if the county rather than the team provided the consideration for the purchases of the contested items, then the team is not the purchaser for sales or use tax purposes and does not owe sales or use tax on the items. *See id.*

The Director claims the team must be the "purchaser" in this case because it made advance payments to three of the nine vendors at issue in this appeal. The AHC did not adopt this argument, and this Court is not persuaded either. First, the team did not make advance payments to the other six vendors at issue, yet the Director treated all purchases the same. Second, the governing agreements contained specific contractual language contemplating the team might, at times, give advance payments for items acquired for the county-owned project and providing that, in each case, the team would be reimbursed from the project fund following completion of the requisite paperwork and approval process. There is no allegation the team failed to follow the procedure for reimbursement. To the contrary, the team was reimbursed in each instance in accordance with the agreements so that consideration for each contested item came from the project fund.

The AHC found, and this Court agrees, the real issue relevant to the identity of the purchaser is not whether the fund paid for the items before or after a particular purchase but whether the monies in the project fund belonged to the team or, instead, to the county/authority. It is to this question this Court now turns.

**B. The Tax Credits Were Not in the Fund Used to Purchase Contested Items**

The first step in determining who owned the monies in the project fund is to clarify what monies that fund contained. As the AHC recognized, the county provided certain monies in the project fund from the sale of bonds. As the AHC also recognized, the tax credits were placed only briefly in the project fund by the project fund trustee. As the AHC in its statement of facts expressly recognized, prior to the purchases in question, the tax credits then were sold to unrelated third parties. The AHC further recognized that it was the proceeds of these sales – not the tax credits – that were left in the fund, stating, "The tax credits were negotiable and sold, with proceeds from this sale remaining in the [relevant] subaccount."

Nonetheless, the AHC concluded the team retained an interest in the project fund because of the tax credits. In relevant part, the AHC said:

> Under § 100.286.6 and .7, the taxpayer (in this case, the Team) was able to carry forward the tax credits for up to five years, or "sell, assign, exchange, convey or otherwise transfer tax credits allowed in subsection 6 of this section." *Hence, the Team's contribution to the MDFB and the tax credits never became the funds of the County.*
> *Therefore, based upon the analysis above, the funds from the NBP subaccount were not the funds of the County or the Authority. Rather, the funds placed in the NBP subaccount were the Team's funds.*

(Emphasis added.) The AHC's legal analysis on which it based its conclusion that the tax credits remained the funds of the team in the project fund was in error. Having transferred the tax credits, the statutory scheme plainly took from the team any legal right it otherwise would have had to carry forward any of the tax credits and bestowed it on the third-party purchasers as assignees of those credits:

12

Notwithstanding any provision of law to the contrary, *any taxpayer may sell, assign, exchange, convey or otherwise transfer tax credits allowed in subsection 6 of this section* under the terms and conditions prescribed in subdivisions (1) and (2) of this subsection. *Such taxpayer, hereinafter the assignor for the purpose of this subsection*, may sell, assign, exchange or otherwise transfer earned tax credits:

(1) For no less than seventy-five percent of the par value of such credits; and
(2) In an amount not to exceed one hundred percent of annual earned credits.

The taxpayer *acquiring earned credits*, hereinafter *the assignee* for the purpose of this subsection, may use the acquired credits to offset up to one hundred percent of the tax liabilities otherwise imposed by chapter 143, RSMo, excluding withholding tax imposed by sections 143.191 to 143.261, RSMo, chapter 147, RSMo, or chapter 148, RSMo. *Unused credits in the hands of the assignee may be carried forward for up to five years….*

*§ 100.286.7, RSMo 2000* (emphasis added). Under this section, having transferred the tax credits to unrelated third parties, the team legally had no right to use the tax credits as the statute unequivocally provides that transferred tax credits *no longer* belonged to the assignor – here, the team – but to the assignees – here, the third-party purchasers – and only the assignees may carry them over.

In other words, the AHC based its decision that the team owned certain monies used to purchase the contested items on its mistaken belief the tax laws gave the team a continuing legal interest in the tax credits. This was wrong. And the AHC itself recognized the tax credits themselves were no longer in the project fund. The tax credits, which were in the hands of unrelated third parties and could not be carried forward by the team, are not a legal basis on which to conclude the team owned monies in the project fund.

While the AHC correctly recognized that *proceeds* of the sale of the tax credits were in the project fund, those proceeds did not belong to the team either. By contract, those

13

proceeds were donated by the team to the trustee to place in the project fund and, therefore, were beyond the team's ownership and control. In fact, the governing agreements specifically provide that the tax credit proceeds were part of the authority/county's contribution to the project, not the team's. *§ 6.05(b)(i), Development Agreement* ("Landlord/County intends to provide the funds for the Landlord/County's Capped Contribution by issuing tax-exempt bonds based on the New County Sales Tax … *and approximately $37,500,000 from the Missouri State Tax Credit Revenues*" (emphasis added)). Likewise, the tax credit agreement provided "the Landlord [the authority] has requested that the [finance board] accept contributions from the Tenant [the team] pursuant to the Tax Credit Statute and make the proceeds of such contributions available to the Landlord [the authority] for the purpose of paying a portion of the cost of the project." It further provided the team "shall not benefit from the Tax Credits," except for any incidental benefit as a result of the county's renovation. *§ 3.7, Tax Credit Agreement*. The third-party proceeds from the sale of the tax credits belonged not to the team, but to the county/authority for use in the county-owned project. To the extent the AHC concluded otherwise, it had no legal basis for doing so.

### C. *Monies the Finance Board Gifted to the Project Belonged to the Project, Not the Team*

The AHC also erred in determining that money the finance board granted to the county for use in the project belonged to the team. The AHC found "the Team's contribution to the [finance board]… never became funds of the County." It never explains why, however, and its legal conclusion is also legally incorrect. The AHC recognized the

14

team donated the money to the finance board to fund the project in return for the tax credits. The burden was on the Director to show the money in the project fund belonged to the team. The Director did not allege, and the AHC did not find, that the donation did not occur or was not properly made, nor did it find for any reason the donation was invalid. In the absence of such findings, there is no legal basis for the AHC's conclusion that money the finance board granted in the project fund granted the finance board remained the team's property.[13]

Indeed, the validity of the mechanism the team used is recognized in the statutes themselves. Section 100.286.6, RSMo 2000, permits the finance board to issue tax credits to a taxpayer who makes a contribution – that is, a donation – to the finance board. Here, the team donated money and received in return tax credits the finance board could authorize only once a donation was made. Once the team donated the money to the finance board, then, like any donation, it no longer belonged to the team but to the donee.[14] The statutes

---

[13] The Director also urges this Court to hold the project trust account funds in the subaccount used to purchase most of the contested items belonged to the team because, under the development agreement, any remaining balance in the project fund was to be refunded to the team, along with the county and authority according to each entity's "cost contribution ratio." The later-executed trust indenture provided for a different allocation of unspent funds. Further, the governing agreements unequivocally provide the project fund contained county funds. In any event, no funds, in fact, remained, so any contingent future interest the team might have had in any excess funds remained inchoate.

[14] Sometimes donors retain an interest in donations, but that is not provided for in Chapter 100. RSMo, and did not occur here. Section 100.263, RSMo 2000, provides that "[t]he infrastructure development fund shall be administered by the board under the provisions of sections 100.250 to 100.297." Once monies are contributed to the finance board, it is the board that "shall have the power to … [d]irect disbursements from … the infrastructure development fund … as provided in sections 100.250 to 100.297." *§ 100.270(6), RSMo Supp. 2006*.

15

were specifically passed to allow donations of this kind, which help the finance board fund projects of economic benefit to the State. *See, e.g., § 100.270(8), RSMo Supp. 2006* ("The board shall have the power to … accept gifts, grants, appropriations, loans or contributions to … the infrastructure development fund … from any source, public or private, and enter into contracts or other transactions with any … private organization, or any other source in furtherance of the purposes of sections 100.250 to 100.297[.]"). It is the finance board that controls the disbursement of funds in its infrastructure development fund under section 100.263, RSMo 2000.[15] There is no dispute the cash donations from the team to the finance board were placed in that fund.

In other words, chapter 100 gives the finance board the legal authority to control the infrastructure development fund, and the team and other donors retain no control over it. For these reasons, there was no basis for the AHC's legal conclusion that funds donated by the team to the finance board, which held those funds in its own infrastructure development fund and in turn granted them to the project, somehow still belonged to the team.

These errors regarding ownership of the project fund constituted legal error. The Director, nonetheless, argues that, even though the team followed the tax statutes and no longer controlled the money it had legally donated to another, to recognize the team parted

---

[15] "An 'Infrastructure Development Fund' shall be established from which moneys shall be used to make … grants to local political subdivisions." *§ 100.263, RSMo 2000.* "[L]oans, loan guarantees, or grants shall only be made upon approval of the board." *§ 100.270(24), RSMo Supp. 2006.* "Within the discretion of the board … the infrastructure development fund ... may be pledged to secure the payment of any bonds or notes issued by the board." *§ 100.286.1, RSMo 2000.* "The board shall have the power to … [m]ake all expenditures which are incident and necessary to carry out its purposes and powers." *§ 100.270(19), RSMo 2000.*

with the money would ignore the "economic realities" of the team's contribution. In other words, the Director basically argues that, because the team once owned the monies and credits it donated and stood to benefit from the renovation of Arrowhead stadium, this Court should ignore the fact that the project funds were not actually the team's when the purchases were made.

This Court is not free to simply ignore the laws governing donations and the relevant tax statutes because the Director does not like the fact that the team ultimately benefited from the project the team helped fund.[16] This Court cannot substitute its judgment for that of the legislature that such projects serve an overarching public purpose. Indeed, in approving similar statutes this Court has long held that, when a public purpose is "apparent, it is unimportant that incidental benefits may accrue to private interests." *State ex inf. Danforth ex rel. Farmers' Elec. Co-op., Inc. v. State Envtl. Improvement Auth., 518 S.W.2d 68, 74 (Mo. banc 1975)*.

This principle was specifically applied in 2006 in approving another sports stadium improvement financing plan. St. Louis County had entered into a series of transactions with the finance board to finance construction of what it anticipated would be the home

---

[16] In the cases discussing looking at the "economic realities" of a situation, *Loren Cook Co. v. Director of Revenue, 414 S.W.3d 451, 454 (Mo. banc 2013)*, and *Great Southern Bank v. Director of Revenue, 269 S.W.3d 22, 25 (Mo. banc 2008)*, this Court rejected the argument taxpayers met the "trade-in exemption" when the economic realities showed the taxpayers had engaged in two separate transactions rather than a true "trade-in." Here, in contrast, there is no question about *what* transactions took place. Tangible personal property was purchased for use in a county-owned renovation project. The question in this case, rather, is *who* is the purchaser under the sales and use tax statutes?

17

stadium of the St. Louis Cardinals baseball team. *Moschenross v. St. Louis Cty., 188 S.W.3d 13, 17 (Mo. App. 2006)*. In determining the constitutional validity of the financing scheme, the court had to consider whether the project was for a public or private purpose. *Id. at 121-22*. It concluded that, "[a]lthough the team owners w[ould] incidentally benefit from the development of the ballpark itself," the project was for a public purpose because, by adding jobs and generating direct and indirect economic impacts as more money was going to be spent throughout the region, the "primary purpose of the development at issue … [was] to increase convention and sports activity in the county and city, thereby resulting in economic benefits to the public." *Id. at 22*.

These principles apply here as well. The finance board found "[t]he benefits to be derived by the State of Missouri are projected to exceed the benefits provided by the Board by this Agreement." *See supra note 7*. The agreements specifically provide that the authority, the county, the team, and, most importantly, the finance board, believe those myriad economic benefits outweigh any benefit to the team and indeed include the "joint agreement by the commissioner of administration, the director of the department of economic development, and the director of the department of revenue *that such action is essential to ensure retention or attraction of investment in Missouri*." *§ 100.286.6, RSMo 2000* (emphasis added).[17]

---

[17] Section 100.286.6, RSMo 2000, in fact, *required* the approval of these officials given the size of the tax credit transaction, and these officials did approve the transaction. That section provides, in relevant part:

18

"It is well established that the right of the taxing authority to levy a particular tax must be clearly authorized by the statute." *State ex rel. Ford Motor Co. v. Gehner, 27 S.W.2d 1, 3 (Mo. banc 1930).* The applicable sales and use tax statutes permit taxation against "purchasers" upon "sales at retail" in the state, or for the privilege of using within this state any tangible property "purchased." *§ 144.020, RSMo Supp. 2006*; *§ 144.610.1, RSMo 2000*. It was the Director's burden to show the team was the purchaser of the items purchased with the monies in the fund. The Director did not do so, and could not do so in this case, as the monies in the fund belonged to the county. The lawful execution of a tax credit transaction as authorized by statute does not provide a legal basis for finding the team was the purchaser in this case. Nor do the tax statutes permit taxation of the team simply because the items procured for the county-owned project would benefit the team during its tenure at Arrowhead. While some may second-guess the wisdom of enacting tax credit statutes, or their use in sports stadium projects, the wisdom of such legislative policy is not relevant to this Court's duty, which is to determine whether the AHC properly concluded the team was the purchaser in this case. Any complaints about the policy embodied in the tax credit statutes should be directed to the legislature.

## IV.    CONCLUSION

---

[T]otal tax credits awarded in any calendar year beginning after January 1, 1994, shall not be the greater of ten million dollars or five percent of the average growth in general revenue receipts in the preceding three fiscal years. This limit may be exceeded only upon joint agreement by the commissioner of administration, the director of the department of economic development, and the director of the department of revenue that such action is essential to ensure retention or attraction of investment in Missouri.

19

For the reasons set out above, the AHC's decision was not authorized by law.  The team was not the source of the consideration for the contested items and, therefore, was not the purchaser of the items for sales and use tax purposes.  The AHC's decision is reversed, and judgment is entered in the team's favor.  *Rule 84.14*.

 

 

_____
**LAURA DENVIR STITH, JUDGE**


All concur.